## UNITED STATES of America, Appellee,

v.

## Sanford POLLACK, Defendant–Appellant.

### No. 2068, Docket 95–1141.

United States Court of Appeals, Second Circuit.

Argued June 10, 1996.

Decided July 31, 1996.

**332**

William I. Aronwald, White Plains, New York, for defendant-appellant.

David Hennessy, Assistant United States Attorney for the Eastern District of New York, Brooklyn New York (Zachary W. Carter, United States Attorney, Peter A. Norling, Assistant United States Attorney, on the brief), for appellee.

Before: OAKES, ALTIMARI, and WALKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Sanford Pollack ("Pollack") appeals from a judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*), convicting him, upon a plea of guilty, of one count of conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 (1994), and sentencing him principally to 12 months' imprisonment. On appeal Pollack challenges the district court's ruling that the government did not breach its cooperation agreement with him. Specifically, Pollack contends that the government

breached its agreement by failing to submit a letter motion to the court pursuant to United States Sentencing Commission, *Guidelines Manual* ("U.S.S.G."), § 5K1.1, p.s. (Nov. 1994), in support of a downward departure. Because we conclude that: (1) the record supports the district court's findings that the government acted in good faith in declining to submit a 5K1.1 letter, and (2) the district court's other sentencing determinations were proper as a matter of law, we affirm.

## BACKGROUND

### 1. *Events Related to the Underlying Charge*

Pollack is an attorney who formerly represented the International Union of Allied Novelty and Production Workers ("Union"). Sometime in the autumn of 1990 the President of the Union, Julius Isaacson ("Isaacson") told Pollack that he wanted to purchase and renovate a building located in Mineola, New York, and use the renovation as a method of obtaining kickbacks from the contractor. Pollack contacted a friend, James Baldo ("Baldo"), who put him in touch with John Careccia ("Careccia"), a contractor willing to pay the kickbacks.

Pollack met with Baldo and Careccia, and hired Careccia to renovate the building. The building purchase closed on January 9, 1991, after which Careccia received $65,000 from the building's seller as a credit for the renovations. Careccia gave Baldo the $65,000, who, in turn, gave $50,000 to Pollack as part of the kickback. Pollack then delivered the money to Isaacson. Subsequently, Pollack participated in a meeting with Baldo and Careccia, during which he instructed Baldo on how to revise the bid submitted by Careccia for the renovation, in order to increase the amount of money he would receive in kickbacks. Careccia was paid for the job from Union funds.

On October 23, 1993, Pollack was arrested. He agreed to cooperate with the government, and in fact provided substantial assistance to the government concerning the embezzlement scheme. A formal cooperation agreement between Pollack and the government was executed on February 9, 1994. In exchange for Pollack's cooperation, Paragraph 5 of the agreement provided that the government would support a downward departure at sentencing by submitting a motion to the court pursuant to U.S.S.G. § 5K1.1, p.s., setting forth the nature and extent of Pollack's cooperation. On May 4, 1994, Pollack pleaded guilty to a one count information charging him with conspiracy to embezzle Union funds, in violation of 18 U.S.C. § 371.

### 2. *Events Related to the Arson of Pollack's Home in Florida*

On March 24, 1992, Pollack's home in West Palm Beach, Florida was destroyed by arson. Pollack told detectives from the County Sheriff's Office that a labor union was responsible for the arson, but an investigation of the arson by Detective Saling of the County Sheriff's Office conducted with the aid of the Bureau of Alcohol, Tobacco and Firearms ("ATF") implicated Pollack's son. In June of 1993 ATF Special Agent Jurison questioned Pollack about the arson, and in November of 1993 notified Pollack's son that he believed either Pollack or the son was involved in the arson.

Meanwhile, Pollack's insurer had commenced an action against Pollack in Florida state court seeking a declaration of non-coverage on the ground that Pollack was involved in the arson. Paragraph 13 of the insurer's complaint alleged that: "In contravention of the policy ... the defendant either directly or indirectly through a third party on their behalf and with their consent caused the fire loss in question at the risk location." In his answer to the complaint, Pollack denied any involvement in the arson. When asked in December of 1993 by the special agent investigating the Union embezzlement whether the arson posed any criminal concerns, Pollack responded that it did not because it was a civil matter. Pollack's defense counsel notified the prosecutor handling Pollack's criminal case in the Eastern District of New York of the civil litigation pending in Florida, and, upon her request, provided her with copies of the pleadings on January 11, 1994.

In April of 1994, Detective Saling was deposed by attorneys representing Pollack in

the Florida action. ATF agent Jurison attended the deposition. At the deposition, Saling explained that the arsonist had cut a hole in the wall of the garage to enter the house, and identified Pollack as a suspect in the arson in light of the recovery of a circular saw embedded with sheetrock dust and chips of wood from Pollack's garage found in Pollack's son's house. Also disclosed at the deposition was the fact that the U.S. Attorney's Office for the Southern District of Florida was conducting an investigation of the arson.

Despite receiving the pleadings in the Florida action in January of 1994 and an ongoing investigation of the arson by the ATF and U.S. Attorney's Office for the Southern District of Florida, the government claims that it first learned that Pollack was the target of the arson investigation in late July of 1994, through a confidential informant. The informant told prosecutors that Pollack had recruited someone to burn down his house. According to the informant, the recruited arsonist suggested to Pollack that he make the arson look like a hate crime, but Pollack refused, explaining instead that he would blame it on union strife. The prosecutor handling Pollack's case summoned him and his attorney to her office on August 4, 1994, and questioned Pollack about the arson. Pollack's attorney confirmed the existence of the criminal investigation, and related to the prosecutor the substance of Detective Saling's and the ATF agents' deposition testimony from the civil suit, including a summary of the evidence compiled against Pollack. Pollack maintained that he was not involved in the arson.

In light of what she had learned, the prosecutor investigated the matter further and concluded that Pollack was, indeed, involved in the arson. On August 24, 1994, the prosecutor again questioned Pollack about his involvement in the arson, and informed him that he would soon be indicted in the Southern District of Florida. The prosecutor told Pollack that if he admitted to participating in the arson, she would work out a deal with the U.S. Attorney's Office in Florida. Pollack, however, continued to profess his innocence. Several days later the government informed Pollack that it would not submit a 5K1.1 letter to the court at sentencing, because it believed that he had breached the terms of the cooperation agreement by: (1) lying about his involvement in the arson, and (2) misleading the government by not revealing that he was under criminal investigation for the arson at an earlier date.

### 3. The District Court's Rulings

Upon being informed that the government would not submit a 5K1.1 letter on his behalf, Pollack moved before the court for specific performance of the cooperation agreement. Hearings on the matter were held on November 22 and December 9, 1994, and on February 1, 1995. As explained in more detail below, at the conclusion of the hearings the district court denied the motion on the ground that the government acted in good faith in electing not to file the 5K1.1 letter. Pollack was then sentenced. At sentencing the district court, among other things, (1) enhanced his base offense level by three points pursuant to U.S.S.G. § 3B1.1(b), because it determined that Pollack was a "manager or supervisor" in the underlying criminal activity, and (2) refused to downwardly depart pursuant to U.S.S.G. § 5H1.6, p.s., on the basis of Pollack's family circumstances. The court sentenced Pollack principally to 12 months' imprisonment.

Pollack now appeals the district court's ruling denying his motion for specific performance of the cooperation agreement, and its sentencing rulings enhancing his base offense level and refusing to downwardly depart on the basis of his family circumstances.

### Discussion

#### 1. The 5K1.1 Letter

Paragraph 5 of the cooperation agreement provides in relevant part that the government's assessment of the truthfulness, completeness and accuracy of Pollack's cooperation "shall be binding upon him." We have previously explained that, because plea agreements are contractual in nature, they "are construed according to contract law principles." *United States v. Yemitan*, 70 F.3d 746, 747 (2d Cir.1995) (citing *United States v. Salcido-Contreras*, 990 F.2d 51, 52

(2d Cir.), *cert. denied,* 509 U.S. 931, 113 S.Ct. 3060, 125 L.Ed.2d 742 (1993)); *United States v. Rexach,* 896 F.2d 710, 713 (2d Cir.), *cert denied,* 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990). In light of such a construction of plea agreements, we have further explained that, "where the explicit terms of a cooperation agreement leave the acceptance of the defendant's performance to the judgment of the prosecutor, the prosecutor may reject the defendant's performance provided he or she is honestly dissatisfied." *Id.; accord United States v. Khan,* 920 F.2d 1100, 1105 (2d Cir.1990), *cert. denied,* 499 U.S. 969, 111 S.Ct. 1606, 113 L.Ed.2d 669 (1991). The government's dissatisfaction, however, may not be premised on bad faith, invidiousness, or dishonesty, *see Rexach,* 896 F.2d at 714; *Khan,* 920 F.2d at 1105 (the prosecutor's "discretion is limited by the requirement that it be exercised fairly and in good faith"), nor on unconstitutional considerations, *see United States v. Resto,* 74 F.3d 22, 26 (2d Cir. 1996).

■ Accordingly, we construe the present plea agreement strictly according to its terms and will not read into it requirements that, while in accord with its "spirit," were not specifically set forth by the parties. Paragraph 3 of Pollack's plea agreement states in relevant part that:

> The defendant will provide truthful, complete and accurate information, and will cooperate fully with the [U.S. Attorney's] Office. This cooperation will include, but is not limited to, the following: (a) The defendant agrees to be fully debriefed, and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities. . . .

Paragraph 6 of the agreement further provides that:

> The defendant must at all times give complete, truthful and accurate information. . . . Should it be judged by the [U.S. Attorney's] Office that the defendant has intentionally given false, misleading or incomplete information . . . the defendant will not be released from his plea of guilty, but this Office will be released from its

obligation under this agreement . . . to file [a motion pursuant to U.S.S.G. § 5K1.1].

The government offered two grounds of dissatisfaction before the district court as a basis for declining to file the 5K1.1 letter as provided for by Paragraph 6 the cooperation agreement. The first ground was that it believed Pollack had misled the government by not revealing the arson investigation at an earlier date, as was allegedly required by the terms of Paragraph 3 of the agreement. The second ground was that it believed Pollack lied about his involvement in the arson in August of 1994, particularly when Pollack maintained his innocence after being informed that the government had concluded he was involved in the arson.

Pollack, on the other hand, contended before the district court, as he does now on appeal, that the government was put on constructive notice of his involvement in the arson when his counsel provided the government with copies of the pleadings in the civil case. Moreover, Pollack contended that the cooperation agreement did not specify that he was obligated to volunteer information concerning his possible involvement in an unrelated arson investigation. According to Pollack, the government acted in bad-faith in declining to submit the 5K1.1 letter, by gaining the benefit of his substantial assistance and then using the pretext of not being told about the arson investigation to excuse its performance under the agreement. Pollack maintains that the government could easily have found out about the arson investigation by following-up on the civil pleadings.

The district court concluded that the government's denial of the 5K1.1 letter was not undertaken in bad-faith, ultimately resting its conclusion on the second ground offered by the government; namely, the government's belief that Pollack was involved in the arson, and its belief that Pollack lied in denying any involvement in the arson when confronted with the government's accusations in August of 1994.

■ We conclude that, although the government was not under an affirmative duty to inquire further into the fire, neither was Pollack under a duty to volunteer information concerning his criminal involvement on a

continuing basis. We disagree with the government's assertion that Pollack's obligation under Paragraph 6 of the plea agreement "at all times" to "give" to the government "complete, truthful and accurate information" places him under an affirmative duty to offer any information to the government in which it may have an interest. Nothing in the agreement specifies that Pollack is under an open-ended duty to volunteer all information, however attenuated its connection to the criminal charges to which he is pleading guilty, in which the government might have some interest. Although the government could have included such a provision in the agreement, it did not, and we will not read one into it.

■ Nonetheless, we affirm the district court on the ground that the government was reasonably and honestly dissatisfied because of its belief that Pollack lied about his involvement in the arson. The government's belief that Pollack was involved in the arson rested, in part, on information supplied by the confidential informant who disclosed Pollack's recruitment of the arsonist and Pollack's intention to attribute the arson to union strife. The informant's statements were corroborated by the fact that Pollack did indeed attribute the arson to a labor union, and by the evidence implicating a circular saw found in Pollack's son's possession. In addition, the government's belief rested on conversations it had with ATF agents and the U.S. Attorney's Office for the Southern District of Florida, confirming that Pollack was involved in the arson, and that he would soon be indicted for the crime. In light of this corroboration, we find no error in the district court's conclusion that the government had a good-faith belief that Pollack was involved in the arson. Moreover, based upon the language of the cooperation agreement, the government could reasonably conclude that Pollack was in material breach of the agreement when he lied about his involvement in the arson. Accordingly, the government was justified in withholding the 5K1.1 letter, and the district court did not err in concluding that the government acted in good-faith in so doing.

### 2. *The District Court's Sentencing Rulings*

Pollack further contends that the district court erred in: (1) enhancing his base offense level by three points pursuant to U.S.S.G. § 3B1.1(b), because it determined that Pollack was a "manager or supervisor" in the underlying criminal activity, and (2) refusing to downwardly depart on the basis of Pollack's family circumstances pursuant to U.S.S.G. § 5H1.6, p.s. Pollack's contentions are meritless.

■ We review the district court's conclusion that a defendant was a "manager" or "supervisor" under U.S.S.G. § 3B1.1(b) *de novo,* as it involves a legal interpretation of the Sentencing Guidelines. *See United States v. McGregor,* 11 F.3d 1133, 1138 (2d Cir.1993) (citing *United States v. Spencer,* 4 F.3d 115, 120 (2d Cir.1993)). Here, the record clearly establishes that Pollack acted as a manager or supervisor of the criminal activity at issue: he hired Careccia, and he actively directed Baldo on how to revise the bid so as to increase the amount of kickbacks to Isaacson. *See United States v. Payne,* 63 F.3d 1200, 1212 (2d Cir.1995) ("A defendant acts as a 'manager or supervisor' ... if he exercises some degree of control over others involved in the commission of the offense, or plays a significant role in the decision to recruit or to supervise lower-level participants.") (internal quotations and citation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). Accordingly, the district court did not err as a matter of law in enhancing Pollack's base offense level under U.S.S.G. § 3B1.1(b).

■ Finally, the district court's decision not to downwardly depart based on the family circumstances presented to it is not appealable. Such decisions are only appealable if the district court's refusal was based on a "mistaken belief that it lacked authority to depart." *United States v. Ekhator,* 17 F.3d 53, 55 (2d Cir.1994). Here, the sentencing transcript clearly indicates that the district court was aware it could downwardly depart on the basis of Pollack's family circumstances, but declined to do so in its discretion.

**Conclusion**

For the reasons stated above, the judgment of the district court is affirmed.