**UNITED STATES of America, Appellee,**

v.

**Santos ESCOTTO, Defendant–Appellant.**

No. 1646, Docket 96–1757

United States Court of Appeals,
Second Circuit.

Argued June 5, 1997.

Decided Aug. 15, 1997.

Steven M. Golub, New York City (Mitchell A. Golub, Golub & Golub, New York City, on the brief), for defendant–appellant.

Stephen D. Kelly, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Susan Corkery, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee.

Before: NEWMAN, KEARSE, and CALABRESI, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily concerns a district judge's decision to respond to a jury's request during deliberations for a readback of the trial testimony of several witnesses by providing the jury with copies of the transcripts of the witnesses' testimony. Santos Escotto appeals from the November 21, 1996, judgment of the United States District Court for the Eastern District of New York (David G. Trager, Judge), convicting him after a jury trial of one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 371, 1341, and 1343 (1994). Escotto's sentence includes a five-year statutory maximum term of imprisonment, three years of supervised release, and restitution of $640,000. In addition to challenging the trial court's decision to provide transcripts in lieu of readbacks, Escotto also raises sentencing issues regarding upward adjustments of his offense level. For the reasons that follow, we affirm the conviction and the sentence.

## Facts

In a one-count indictment, the Government charged that from August 1993 to December 1994, Santos Escotto, along with Patrice Lambert, Ajamu Abraham, Raul D'Acosta, Marcel Harris, Kenny C. Francis III, John Fields, and Thomas Hackley, conspired to operate a fraudulent telemarketing scheme. The scheme operated in Brooklyn, New York, from three "boiler room" companies— Golden Star Enterprises ("Golden Star"), Enigma Enterprises ("Enigma"), and Platinum Industries ("Platinum"). Purposefully targeting elderly people, the conspirators used high pressure sales pitches to extract large sums of money from their victims supposedly in return for various products and the chance to win luxury prizes in sweepstakes or promotions. The Government's evidence demonstrated that the luxury prizes and sweepstakes did not exist, and that on the few occasions when any of the products were delivered, they were seriously overvalued.

Raul D'Acosta and John Fields agreed to cooperate with the Government and testified at Escotto's trial. According to their testimony, Escotto was a part-owner of all three companies, and a manager at Golden Star and Enigma. Documentary evidence established that Escotto signed payroll checks at

Golden Star, and there was testimony that Escotto not only helped to hire salesmen, but also provided "leads" for potential customers and employee training.

At Platinum the salesmen used a "government recovery pitch" to extract additional money from victims who had previously sent money to other telemarketing companies. Posing on the telephone as attorneys working for a Government agency, Platinum salesmen would tell their victims that the Government had sued the telemarketing companies and had recovered a sizeable legal settlement from which restitution would be paid to any victims of the fraud who were willing to pay their share of the attorney's fees. Of course, Platinum was not affiliated with the Government, and the recovery pitch was merely a scam to further defraud elderly people. D'Acosta testified that Abraham, Harris, and Fields formed Platinum because they felt they were not making enough money at Enigma. While there was no evidence that Escotto ever visited or worked at Platinum, both Fields and D'Acosta testified that Escotto was present during meetings where the plans for Platinum were discussed, and that Escotto provided start-up money for the new company in return for which he was supposed to receive a share of the profits.

During jury deliberations, the jury asked for a reading of the testimony of three witnesses. Under circumstances elaborated below, the District Court responded by supplying the jury with redacted versions of the witnesses' testimony. The jury received the redacted transcripts shortly before retiring on the afternoon of the first day of deliberations. The following afternoon, after a brief deadlock, the jury returned a guilty verdict against Escotto, and an acquittal of his co-defendant, Hackley.

At sentencing, Judge Trager increased Escotto's offense level by four levels for his leadership role in the offense, *see* U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 3B1.1(a) (1995), and by another two levels because the fraud involved the misrepresentation at Platinum that the salesmen were acting on behalf of a government agency, *see id.* § 2F1.1(b)(3)(A).

Escotto's main contention on appeal is that he was denied a fair trial because the District Judge supplied transcripts instead of having the requested testimony read. He also challenges the evidentiary foundations for the trial court's upward adjustments of his offense level.

## Discussion

### I. Transcripts

The primary issue is the propriety of Judge Trager's response to the jury's request for readbacks. During both preliminary and final jury instructions, Judge Trager had told the jury that testimony could be read back if necessary to aid deliberations. During deliberations, the jury sent a note asking for a readback of the complete testimony of the three cooperating witnesses. Their testimony was the crux of the Government's case, and, in some respects, had been inconsistent.

On receipt of the jury's request, Judge Trager advised the attorneys that instead of permitting a readback, he would provide the jury with two copies of the transcript of the three witnesses' testimony, and he instructed the attorneys to prepare a redacted version of the transcripts, omitting colloquy and stricken testimony. He indicated that in his opinion a readback of hundreds of pages of testimony would hinder the jury's ability to deal with all of the testimony in a reasoned fashion.

Defense counsel objected, but conceded that he would not be opposed to providing the transcripts for use in the jury room if the testimony was first read back, as the jury had requested. The readback, he urged, would ensure that every juror would hear the same thing, and would protect against individual jurors' taking pieces of testimony out of context.

In response to the objection, Judge Trager stated, in essence, that having the transcripts would afford each juror the opportunity to draw the others' attention to specific portions of the testimony, and that regardless of whether individual jurors were better readers or a better listeners, all would benefit from having the transcripts available to be

read aloud during the deliberations. In addition, Judge Trager reiterated that when the jury has asked to rehear extensive portions of testimony, a readback is not efficient, and providing the jury with transcripts is preferable.

▆▆▆ Although we recognize that the decision to permit or deny readbacks of testimony when requested by a jury during deliberations is within the broad discretion of the trial court, see, e.g., United States v. Criollo, 962 F.2d 241, 243 (2d Cir.1992) (collecting cases), we have also instructed that a trial court's response to any particular request should be guided by consideration of the jurors' need to review the evidence before reaching a verdict, assessed against the difficulty in locating the specific testimony requested, the possibility of undue emphasis on any portion of the testimony, and the possibility of undue delay in the trial, id. We have also stated a clear preference for readbacks whenever they are requested by a deliberating jury. Id. at 244. Indeed, we have explicitly held that it is not within the trial court's discretion to announce a wholesale prohibition on readbacks, id., and we have expressed disapproval of the practice of discouraging the jury from requesting them, see United States v. Damsky, 740 F.2d 134, 138 (2d Cir.1984) (noting that such a practice "does not seem to be particularly wise").

Though some courts have concluded that there is no material difference between sending the jury written transcripts of trial testimony and providing for in-court readbacks, e.g., United States v. Bertoli, 40 F.3d 1384, 1400 (3d Cir.1994); United States v. Zarintash, 736 F.2d 66, 70 (3d Cir.1984), others have noted that permitting the jury to have unsupervised access to written transcripts poses an enhanced danger that jurors may unduly emphasize discrete sections of the trial testimony, see, e.g., United States v. Hernandez, 27 F.3d 1403, 1408–09 (9th Cir. 1994) (citing United States v. Lujan, 936 F.2d 406, 411–12 (9th Cir.1991)).

Generally, however, appellate courts have not found it to be an abuse of discretion to provide the jury with transcripts, at least when the trial judge has given some precautionary instruction to lessen the risk of undue emphasis on the transcript. See Bertoli, 40 F.3d at 1401; Lujan, 936 F.2d at 411; United States v. Betancourt, 838 F.2d 168, 175 (6th Cir.1988); cf. Hernandez, 27 F.3d at 1408–09 (granting a new trial for sending transcripts without giving precautionary instruction); Government of the Canal Zone v. Scott, 502 F.2d 566, 570 (5th Cir.1974) (upholding denial of request where trial judge noted danger of undue emphasis).

▆▆▆ The Third Circuit has noted that the possibility of undue emphasis on transcripts sent in lieu of readbacks is minimal when the jury has asked to rehear extensive sections of testimony. See Bertoli, 40 F.3d at 1401. We agree with the Third Circuit and also with Judge Trager's reasoning in the instant case that written transcripts provide the jury a more efficient method than readbacks of sorting through lengthy portions of testimony. The opportunity to turn pages of transcripts, some rapidly and some leisurely, will often be preferable to enduring a verbatim and usually unanimated rereading of testimony. See United States v. Grant, 52 F.3d 448, 450 (2d Cir.1995).

In United States v. Russo, 110 F.3d 948, 953–54 (2d Cir.1997), we considered the analogous issue of furnishing the jury with written jury instructions, and we noted that such a practice is substantially more efficient than rereading the instructions in court. At the same time, however, we acknowledged that other courts have been concerned about a risk that the jury might misuse a written charge, and we noted that the judge in Russo effectively minimized this risk by cautioning the jury to consider the charge as a whole and to seek an explication if necessary. Id. at 954.

▆▆▆ While we recognize that supplying transcripts of trial testimony poses some risk of undue emphasis on selected passages, we conclude that the decision to provide the jury with transcripts in lieu of requested readbacks should be left to the trial court's discretion, just like the decision as to a request for transcripts, see United States v. Pollak, 474 F.2d 828, 832 (2d Cir.1973). The decision to supply transcripts, either when requested or in lieu of a requested readback,

should generally be guided by the same considerations that apply to a decision to permit a readback of testimony. Whether a court permits readbacks or sends transcripts, appropriate cautions should be given to the jury to minimize the particular risks associated with either technique. For example, a jury instruction reminding the jury to consider all the evidence without unduly emphasizing any portion of it would be appropriate in most cases where the court sends transcripts into the jury room.

In the pending case, we see no abuse of discretion in Judge Trager's decision to provide written transcripts in lieu of readbacks. Escotto argues that because the primary strategy of his defense was to attack the credibility of the Government's main witnesses, the printed transcripts were an inadequate substitute for the requested oral readbacks, and that providing 400 pages of transcripts might have overwhelmed the jury. We have no reason to believe that lengthy written transcripts would overwhelm the jury at all, and surely no more than would many hours of live readbacks in open court.

Slightly more troublesome is the fact that by furnishing the transcripts instead of providing a readback, Judge Trager departed, without explanation, from the assurance concerning readbacks that he had given the jury in his preliminary and final instructions. It would have been preferable had Judge Trager indicated in his instructions that readbacks *or* transcripts would be available during deliberations if reasonable requests were made. And some explanation would have been helpful as to why he had decided to supply transcripts rather than permit a readback.

Finally, to the extent that Escotto is arguing that it was error to provide the transcripts without giving a cautionary instruction, we reject this argument because it was not raised in the trial court. *See* Fed. R.Crim.P. 51. We note, however, that when a trial court decides to provide written transcripts, a cautionary instruction is advisable.

## II.  Sentencing

Escotto contends that the evidence did not support the increases to his offense level because of (a) his leadership role in the offense, *see* U.S.S.G. § 3B1.1(a), and (b) the misrepresentation about acting for a government agency, *see* *id.* § 2F1.1(b)(3)(A). Rather than making factual findings on the record, Judge Trager stated that he would accept the presentence report ("PSR") as to both offense level increases.

A district court's factual findings are reviewed under the clearly erroneous standard, *e.g.*, *United States v. Leonard,* 37 F.3d 32, 37–38 (2d Cir.1994), but the determination that those findings support a sentencing enhancement is a legal conclusion that we review *de novo*, because it involves an interpretation of the Guidelines, *e.g.*, *United States v. Pollack,* 91 F.3d 331, 336 (2d Cir. 1996).

(a) *Leadership Role.* Section 3B1.1(a) provides for a four-level increase if the criminal activity involved more than five participants and the defendant was an "organizer or leader" of the activity. U.S.S.G. § 3B1.1(a) (1995). As we have repeatedly stressed, a prerequisite to a section 3B1.1(a) enhancement is that the district court makes specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive. *See e.g.,* *Pollack,* 91 F.3d at 336; *see also United States v. Liebman,* 40 F.3d 544, 548–49 (2d Cir.1994) (remanding for factual findings regarding the number of participants); *cf. United States v. Fermin,* 32 F.3d 674, 682 (2d Cir.1994) (remanding for factual finding regarding managerial or supervisory role to support section 3B1.1(b) enhancement). The district court is entitled to rely on the factual findings in the PSR, provided, however, that the court explicitly adopts them, as Judge Trager did here. *See United States v. Williams,* 23 F.3d 629, 635 (2d Cir.1994).

Escotto's PSR indicates that there were more than five participants in the conspiracy. In addition, it states that Escotto's leadership role was demonstrated by the cooperating witnesses' testimony that he sup-

plied "leads" for potential customers and that he, along with others, set up all three of the companies.

■ However, Escotto asserts that Fields and Williams were "thoroughly discredited on cross-examination," Brief for Appellant at 19, and that although D'Acosta initially testified that Escotto owned Golden Star and Enigma, D'Acosta's later testimony attributed the ownership and leadership to Patrice Lambert. Even if we were to consider Escotto's first argument to be persuasive, which we do not, the commentary to section 3B1.1 states unequivocally that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 comment. (n.4). Thus, the finding that Escotto organized and led the conspiracy, even if he did so at the same time as Lambert, was not clearly erroneous, and suffices to support the enhancement.

■ (b) *Government Recovery Pitch.* In the case of jointly undertaken activity, specific offense characteristics are determined by "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See* U.S.S.G. § 1B1.3(a)(1)(B). Under the specific offense characteristics of the fraud guideline, a two-level increase is appropriate if the fraud involved a misrepresentation that the defendant was acting on behalf of a government agency. *Id.* § 2F1.1(b)(3)(A).

Escotto contends that he did not merit the two-level increase because the Government's evidence did not show that he was connected to Platinum, and did not demonstrate that he ever visited its location. We reject this argument. The trial testimony clearly established that Escotto attended meetings to set up Platinum, that he helped to finance its inception, and that he expected a share of the profits. As the PSR noted,

> According to [D'Acosta], Platinum was started after a meeting attended by the management and [top salesmen] at Enigma. At that meeting, the participants agreed that Platinum would be a secret company formed·by the [top salesmen] at Enigma to generate more money.

PSR, ¶ 11. The use of the government recovery pitch was at least reasonably foreseeable by Escotto, even if he did not personally go to Platinum, and even if the pitch was not conducted under his explicit direction. The enhancing conduct was relevant conduct by those engaged with Escotto in a criminal enterprise. *See* U.S.S.G. § 1B1.3(a)(1)(B).

### Conclusion

The conviction and the sentence are affirmed.