**UNITED STATES of America, Appellee,**

v.

**Vinal S. DUNCAN, Defendant–Appellant.**

**No. 1444, Docket 93–1402.**

United States Court of Appeals, Second Circuit.

Argued April 13, 1994.

Decided Dec. 2, 1994.

David T. Grudberg, New Haven, CT (Ira B. Grudberg, Jacobs, Grudberg, Belt & Dow, P.C., of counsel), for defendant-appellant.

Carl Schuman, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty. D. Conn., New Haven, CT, Amy B. Lederer, Asst. U.S. Atty., Hartford, CT, of counsel), for appellee.

Before: FEINBERG, PIERCE and MINER, Circuit Judges.

PIERCE, Circuit Judge:

Vinal S. Duncan appeals from a judgment of conviction entered on May 28, 1993 in the United States District Court for the District of Connecticut (T.F. Gilroy Daly, *Judge*), following a jury trial. On October 1, 1992, Duncan was charged in a multi-count indictment with conspiracy, bank fraud, and making corrupt payments to public officials. Specifically, Count One charged Duncan with conspiring (1) to impair and impede the lawful functioning of the Internal Revenue Service ("IRS"), (2) to impair and impede the lawful functioning of the Federal Home Loan Bank Board ("Federal Bank Board"), and (3) to commit bank fraud, all in violation of 18 U.S.C. § 371. Count Two charged Duncan with bank fraud, in violation of 18 U.S.C. § 1344. Count Four charged Duncan with conspiring to make corrupt payments to public officials, in violation of 18 U.S.C. § 371. Count Five charged Duncan with making

corrupt payments to public officials, in violation of 18 U.S.C. § 666(a)(2).[1]

The jury convicted Duncan on Counts One, Two, Four and Five. On May 21, 1993, the district judge sentenced Duncan to sixty months incarceration on Count One and sixty months incarceration on Count Two (pre-guideline counts). Judge Daly concluded that the United States Sentencing Guidelines ("U.S.S.G.") applied to Counts Four and Five and imposed a four-level upward adjustment for Duncan's leadership role in the corrupt political payment scheme pursuant to U.S.S.G. § 3B1.1(a). He adjusted Duncan's sentence upward an additional two points for perjury pursuant to U.S.S.G. § 3C1.1. Consequently, the court sentenced Duncan to sixty months imprisonment on Count Four and sixty-five months for Count Five. All sentences were ordered to run concurrently. In addition, supervised release was imposed for a three-year term. Duncan was ordered to pay concurrent fines of $100,000 on Counts Four and Five and a $200 special assessment.

On appeal, Duncan contends that (1) the district court erred by admitting the expert testimony of an IRS agent which stated a legal conclusion; (2) his conviction on Counts One and Two were barred by the *Ex Post Facto* Clause and Count One is time-barred; and (3) the district court erred by upwardly adjusting his sentence for a leadership role in conjunction with the political corruption charge. For the reasons stated below, we reject all of appellant's claims and we affirm the judgment.

## BACKGROUND

The charges in this case arise from two separate criminal schemes. The conspiracy, bank fraud and tax-related charges (Counts One and Two) stem from defendant's involvement in the fraudulent acquisition and sale of property on Meriden Road while a director of Security Savings & Loan Association ("SSLA"). The corrupt political payoff charges (Counts Four and Five) stem from payments made by The Taft Group, Inc. (the "Taft Group"), a corporation comprised of Duncan and two others, to Joseph J. Santopietro, the former Mayor of Waterbury, Connecticut and to Santopietro's family and associates.

*SSLA and the Meriden Road Transaction*

The basic facts of the Meriden Road transaction are undisputed. In November of 1980, Duncan and approximately thirteen other investors formed the bank, SSLA. Duncan was a bank director and later a member of the bank's loan committee.

In 1983, SSLA planned to open a new branch on the east side of Waterbury. Bank officials identified two adjoining parcels of land located on Meriden Road in Waterbury as a potential site. The five directors on SSLA's loan committee—Duncan, Richard Barbieri, Mario Albini, Domenic Daddona and Francis Campion—discussed purchasing the properties for themselves and leasing the properties to the bank. Barbieri, who was also SSLA's president, informed the other committee members that the Federal Bank Board regulations prohibited such a purchase unless all of the bank's directors were involved in the transaction. Nevertheless, in February of 1983, the five committee members, without disclosing their intentions to the bank's other directors, purchased the properties secretly through a nominee, John Colucci—a longtime personal friend of Duncan. Colucci obtained a $200,000 purchase money mortgage from SSLA to buy the properties. Without informing the other directors of their interest in the properties, Duncan, Barbieri, Daddona and Campion, as members of the loan committee, voted to grant Colucci the loan. Thereafter, Colucci leased one of the two parcels to the bank to use as a branch office. Duncan was a partner along with the other four beneficial owners of the subject Meriden Road properties (hereinafter collectively, the "beneficial owners") in a separate partnership called Shaw Management. Through Shaw Management,

---

**1.** Count Three alleged a criminal forfeiture claim based on the bank fraud count, pursuant to 18 U.S.C. § 982(a)(2). The Government chose not to pursue this claim and it is not a subject of this appeal. Count Six was a separate 18 U.S.C. § 371 conspiracy charge to defraud the United States by impairing, obstructing and impeding the lawful function of the Department of Treasury and IRS in its assessment and collection of taxes. Duncan was acquitted of this charge.

Duncan managed the properties for Colucci and reimbursed him for any tax liabilities incurred as a result of his nominal ownership.

In their capacity as SSLA directors, Duncan and the other beneficial owners voted to purchase one parcel from Colucci without disclosing their interest to the other directors. Colucci sold the property to SSLA for $200,000 and used the proceeds to pay off the remainder of the mortgage. In 1985, under similar circumstances, SSLA bought the remaining parcel for $135,000. Thereafter, Colucci paid $20,000 to each of the beneficial owners, including Duncan, in several checks of less than $10,000 each.[2] Once again, Duncan and the other beneficial owners did not inform SSLA's other directors that they were the true owners of the purchased property. In addition, Duncan did not report his profits from the sales of these properties on his tax returns.

The Government presented evidence at trial that in the Spring of 1990, Duncan, Barbieri and Campion learned that bank regulators and investigators were probing banking practices at SSLA. Barbieri and Campion testified that they and Duncan met shortly thereafter and agreed to continue to conceal their involvement in the Meriden Road properties. Duncan did not deny his involvement in the Meriden Road transactions. Rather, he asserted that he lacked the necessary intent to defraud the bank, the Federal Bank Board, or the IRS.

In July 1990, federal regulators forced Barbieri and John Corpaci, SSLA's executive vice president, to resign from their positions at SSLA. Subsequently, three separate investigations were commenced: an investigation into SSLA's bank practices by the Office of Thrift Supervision ("OTS"), a criminal inquiry into the bank's practices by the FBI, and a political corruption and tax investigation by the FBI and IRS. The IRS case agent, Thomas Mulligan, ("Agent" or "Agent Mulligan"), who would later testify about the Meriden Road transactions and the general

functioning of the tax system at Duncan's trial, participated in the investigation.

*Corrupt Payments to Political Officials*

In 1986, Duncan along with Barbieri and Corpaci formed the Taft Group. Duncan was the president, Barbieri, the vice-president, and Corpaci, the secretary-treasurer. The Taft Group was primarily involved in real estate development and investments.

The record evidence discloses that Joseph Santopietro was elected Mayor of Waterbury in 1985. Shortly after taking office, he struck a deal with the Taft Group wherein he and his associates would profit from the Taft Group's real estate and investment opportunities in exchange for favorable treatment by the Administration and city agencies. Between 1986 and 1990, many payments and benefits were extended to Santopietro and his associates. Specifically, Santopietro was often permitted to participate or benefit financially from the Taft Group's real estate deals and he and his associates were given favorable treatment at SSLA. In addition, the Taft Group made payments to Santopietro, frequently funneling payoffs to him through his associates or through sham transactions.

At trial, Duncan did not deny that public officials were given corrupt payments. However, Duncan contended that he lacked guilty knowledge and intent to make improper payments. In contrast, Duncan's partners, Barbieri and Corpaci, each of whom had pleaded guilty and had agreed to testify for the Government, provided testimony concerning Duncan's guilty knowledge and intent.

**DISCUSSION**

Duncan contends on appeal that: (1) the expert testimony of Agent Mulligan invaded the province of the jury by stating a legal conclusion; (2) his conviction on Counts One and Two were barred by the *Ex Post Facto* Clause and Count One is time-barred; and (3) the sentencing judge clearly erred in adjusting upward Duncan's sentence, because

---

**2.** As of the pertinent dates herein, federal law has required financial institutions to report to the Commissioner of Internal Revenue all deposits that total $10,000 or more. 31 C.F.R. § 103.22(a)(1). Checks for less than $10,000, cashed on different days, have not been subject to this reporting requirement. *See id.* at § 103.22.

Duncan contends that there is no evidence that he played a leadership role in the political corruption scheme. We address each of these contentions in turn.

*Expert Testimony*

 Duncan's contention that the expert testimony of Agent Mulligan was erroneously admitted lacks merit. As a general proposition, the decision of whether to admit expert testimony is left to the discretion of the trial judge and should not be set aside unless "manifestly erroneous." *United States v. Schwartz,* 924 F.2d 410, 425 (2d Cir.1991). Generally, expert testimony may be admissible if it is helpful to the trier of fact. *See* Fed.R.Evid. 702. Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative. *See, e.g., United States v. Mohney,* 949 F.2d 1397, 1406–07 (6th Cir.1991) (IRS agent's expert testimony was critical as it created framework for the jury to properly understand the testimony of other witnesses), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.) ("in complex cases ... expert testimony may help a jury understand unfamiliar terms and concepts"), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Carson,* 702 F.2d 351, 369 (2d Cir.) (testifying police officers had "specialized knowledge, not possessed by the jury" which was helpful in understanding narcotics trafficking), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Generally, the use of expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Bilzerian,* 926 F.2d at 1294; *accord United States v. Scop,* 846 F.2d 135, 140 (2d Cir.), *rev'd in part on reh'g on other grounds,* 856 F.2d 5 (2d Cir.1988); *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 510–11 (2d Cir.), *cert. denied,* 434

U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion. *Hygh v. Jacobs,* 961 F.2d 359, 363 (2d Cir.1992); *Bilzerian,* 926 F.2d at 1294; *Scop,* 846 F.2d at 140. Relying on this rule and specifically on our holding in *Scop,* Duncan asserts that the testimony of the Agent went beyond the scope of permissible opinion testimony and, accordingly, asks this Court to reverse his conviction. Appellant's reliance on *Scop* and other such cases, however, is misplaced, since the instant case is distinguishable from the cited cases.

In *Scop,* we reversed appellant's conviction for securities fraud on the grounds that an expert witness stated "highly prejudicial" legal conclusions in expressing his opinion about the defendant's conduct. 846 F.2d at 140. In holding the testimony of a Securities and Exchange Commission ("SEC") investigator inadmissible, we were particularly concerned that the witness repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated and used judicially defined terms such as "manipulation," "scheme to defraud" and "fraud" in opining on the defendant's conduct. *Id.* The present case does not pose the same difficulties. Agent Mulligan did not couch his opinions in terms that derived their definitions from judicial interpretations. We note that by stating that falsified IRS filings "obstruct[ ] and defeat[ ] [the] entire process," the Agent did come close to tracking the object of one of the charged conspiracies in Count One, namely that Duncan "obstruct[ed] and defeat[ed] the ... [IRS] in its lawful function of assessing and collecting income taxes." [3] However,

---

**3.** Appellant takes exception to a number of questions which the Government was permitted to ask the Agent concerning the proper functioning

of the tax system and the importance of filing tax returns accurately. These questions, however, did not ask the witness to express legal conclu-

this was a single occurrence and he did not, as the witness did in *Scop*, use any legally specialized terms such as "scheme to defraud" or "manipulation." *See id.* at 142 (noting with disapproval that the SEC investigator *repeatedly* used the statutory and regulatory language). Moreover, the present case is distinguishable from *Scop* in that Agent Mulligan's testimony was based on personal knowledge. The *Scop* court found the SEC investigator's testimony particularly objectionable because his stated conclusions were not based on personal knowledge, but on his assessment of the testimony and credibility of other witnesses. *Id.* Therein, we found that the investigator encroached upon the exclusive province of the jury in weighing witness veracity. *Id.* Herein, Agent Mulligan testified based on his own investigation of the facts and review of the records. The testimony he presented did not rely on the credibility of other witnesses as in *Scop*.[4] *Id.* Furthermore, this case fits within the distinction enunciated in *Schwartz*, 924 F.2d at 426 (testimony by investigating agent that defendants' activities were "illegal" not improper). In *Schwartz*, we explicitly distinguished *Scop* from situations where, as here, the investigating agent testified "not simply as an expert, but also as a witness to the investigation." *Id.* In sum, this case simply does not present the dangers which compelled us to exclude the testimony of the SEC investigator in *Scop*.

*Hygh* is similarly inapposite. *Hygh* was a civil rights action brought against a police officer which alleged excessive use of force. 961 F.2d at 361. During trial, an expert testified that the use of force by the defendant constituted "deadly physical force" and was not "justified under the circumstances." *Id.* at 361–62, 364. The witness further testified that the police officer's conduct was "totally improper." *Id.* at 364. The ultimate issue before the jury was whether the defendant used excessive force. *Id.* In holding that the expert's testimony was impermissible, this Court found that the witness went beyond simply making factual conclusions and instead asserted "conclusory condemnations ... [which] merely told the jury what result to reach." *Id.* (citations and internal quotations omitted). Here, although Agent Mulligan stated certain factual conclusions, he never expressed an opinion as to whether Duncan was guilty of the offenses charged. The Agent did use the term "money laundering" and stated that "[t]here are a minimum of 20 false tax returns that involved the Meriden Road transaction alone." However, Duncan was not charged with filing false tax returns or with money laundering. Further, the Agent did not comment as to whether Duncan was guilty of conspiring to impair

---

sions, but only to explain sophisticated aspects of a regulatory system for which the witness had expertise. We have generally permitted the elicitation of testimony from expert witnesses that shed light on activities not within the common knowledge of the average juror. *See, e.g., Carson*, 702 F.2d at 369; *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). This case is distinguishable from *United States v. Cruz*, 981 F.2d 659 (2nd Cir.1992), where the Court noted that the proposition that jurors required expert guidance in understanding the facts was "doubtful." *Id.* at 662. Here, the testimony was vital to contradict Duncan's assertion that since Colucci paid taxes on the property, the government did not lose anything by Duncan's inaccurate tax filings. Agent Mulligan's testimony explained to the jury why it was important that the actual owner of the property pay the taxes. Thus, appellant's assertion that the testimony "had no legitimate relevance" is unsupported.

4. Appellant correctly asserts that part of the Agent's investigation was "many interviews with Colucci and Barbieri," two government witnesses. However, he erroneously suggests that these interviews necessarily influenced the Agent's testimony. The language which is arguably objectionable—that the tax returns were "false" and that "money-laundering" took place—did not require assessment of any witnesses' credibility. It is undisputed that Duncan was a part owner of the Meriden Road properties and a review of his tax filings reveals that he did not pay taxes on that land. Similarly, there was evidence such as records of Taft Group transactions that indicated money had been laundered. In addition, while Duncan claims he was unaware that the Taft Group was used to launder money, he does not challenge that it could have occurred. Hence, Agent Mulligan could easily have concluded that tax filings were false and money was laundered without weighing the testimony of other witnesses.

the lawful functioning of the IRS or to commit bank fraud, the crimes with which Duncan was charged. He merely posited factual conclusions which are not prohibited even if "they embrace an ultimate issue to be decided by the jury." *Bilzerian,* 926 F.2d at 1294; *see also* Fed.R.Evid. 704(a). This Court has found the distinction between factual conclusions and legal conclusions to be an important one in the context of expert opinion. "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian,* 926 F.2d at 1294. The advisory committee's note relating to Fed.R.Evid. 704 illustrates this distinction with an illuminating example. It states:

> [T]he question, "Did T have the capacity to make a will?" would be excluded [because the answer would merely tell the jury what result to reach], while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

*Id.* Here, the terms "money laundering" and "false" are analogous to the advisory committee's second question—although the answer sought is a factual conclusion, it does not simply tell the jury what decision to make. Agent Mulligan's testimony falls within the pertinent part of Fed.R.Evid. 704(a), which reads: "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* Accordingly, we find that Agent Mulligan's testimony was admissible.

■ Even if we were to hold to the contrary, such an error in the overall context of this case would be harmless. *See* Fed. R.Civ.P. 61. It is well-established that the party asserting error bears the burden of demonstrating prejudice. *See Palmer v. Hoffman,* 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943); *Hygh,* 961 F.2d at 365; *United States v. Seaboard Sur. Co.,* 817 F.2d 956, 964 (2d Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 115 (1987).

Here, the allegedly impermissible testimony "was expressed within a larger body of otherwise unobjectionable testimony concerning [the functioning of the tax system] from which the jury could easily have drawn the same conclusions that [the witness] did." *Hygh,* 961 F.2d at 365. Furthermore, the Government presented a great deal of other evidence that Duncan did indeed impair and impede the lawful functioning of the IRS by not filing tax returns on property in which he had an interest, including his actual tax returns and direct testimony of his partners. Similarly, there was sufficient additional evidence that the Taft Group, and specifically Duncan, was involved in a political corruption scheme. *See Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (error is harmless if we can conclude that the testimony was "unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record"). Finally, the trial judge instructed the jury to weigh the testimony of all witnesses "alike" and that "the testimony of law enforcement officers ... [was] entitled to no special sanctity or suspicion." *Cf. Hygh,* 961 F.2d at 365 (the Court noted that the "trial judge instructed the jury that it could reject testimony 'if, after careful consideration of the evidence, you simply disagree with it' ").

Federal Rule of Civil Procedure 61 sets forth the applicable standard for determining if error is harmless. It states, in pertinent part: "No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice." *Id.* Reviewing the record in total, we conclude that "substantial justice" would not require us to reverse appellant's conviction even if we were to find the district court erred on the expert testimony ruling. *See Hygh,* 961 F.2d at 365; *United States v. Rea,* 958 F.2d 1206, 1219–21 (2d Cir.1992).

*Ex Post Facto Clause and Statute of Limitations*

■ Next, Duncan contends that his convictions for bank fraud and conspiracy to commit bank fraud are barred by the *Ex*

*Post Facto* Clause [5] because all elements of the conspiracy occurred prior to the enactment of the bank fraud statute, 18 U.S.C. § 1344. He argues that any activity which may have constituted conspiracy to commit bank fraud and actual bank fraud concluded prior to 1984, when he and the other members of SSLA's loan committee agreed to secretly purchase the Meriden Road properties and later sell them to the bank at a profit. We are unpersuaded by his argument.

Duncan concedes that, according to our precedents, continuing offenses such as conspiracy and bank fraud do not run afoul of the *Ex Post Facto* Clause if the criminal offenses continue after the relevant statute becomes effective. *See United States v. Torres*, 901 F.2d 205, 226 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Ferrara*, 458 F.2d 868, 874 (2d Cir.), *cert. denied*, 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972). As Duncan correctly asserts, the bank fraud statute did not take effect until October 12, 1984. 18 U.S.C. § 1344. Thus, the question for us to determine is whether Duncan, or a co-conspirator, continued the criminal fraud after October 12, 1984.

Appellant acknowledges that the second parcel of the Meriden Road properties was sold to SSLA in April of 1985 and, shortly thereafter, the resulting profits were distributed to the beneficial owners in checks of less than $10,000. He posits, however, that the sale of the land and distribution of the profits was not a component of the bank fraud or conspiracy and, therefore, not a continuation of the criminal venture. His argument rests on an inaccurate interpretation of the crime charged.

Under Title 18 of the United States Code, Section 1344, persons are guilty of bank fraud if they "knowingly execute[ ], or attempt[ ] to execute, a scheme ... to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." *Id.* Duncan assumes that the fraudulent scheme with which he was charged and convicted under this statute was the "usurpation of ... [SSLA's] 'corporate opportunity.' " So construed, he concludes that the fraud was complete when the opportunity was usurped—at the time the properties were purchased. But, the Meriden Road conspirators did not merely intend to seize for themselves two pieces of property at a bargain. Rather, the central purpose of the charged scheme was to secretly purchase and then *sell* the properties to the bank at a premium. The Government presented ample evidence to demonstrate that the conspirators purchased the properties knowing that they could extract a greater price from SSLA and decided to make a profit accordingly. It is thus reasonable to conclude that profiteering from the premium sale of these properties to SSLA was the central object of the charged criminal conduct. To hold otherwise would require us to divorce the initial deception of the bank from the central purpose of the fraudulent venture, which we are not prepared to do. We therefore conclude that the scheme was not fully executed until Duncan and his co-conspirators reaped a profit from the transactions.

It is undisputed that Duncan and the other beneficial owners sold SSLA the first parcel of land in October of 1984 for $200,000 and the second parcel in April of 1985 for $135,000. With the sale of the first property, the beneficial owners were able to recoup their initial investment of $200,000. With the sale of the two properties combined, Duncan and his co-conspirators secured $335,000 and netted an aggregate profit of $135,000, approximately 67% on their initial investment. Given these facts, it was certainly reasonable for the jury to conclude that the extraction of this large profit, due to the fraudulent actions of Duncan and his co-conspirators, was completed only after the sale of the second parcel in 1985. It is likely that the jury was referring to the sale of this second property

---

5. An *Ex Post Facto* law is one which (1) punishes an act which was innocent when done, (2) makes the punishment of a crime more burdensome after its commission, or (3) deprives the defendant of any defense that was legally available at the time the offense was committed. *See Beazell v. Ohio*, 269 U.S. 167, 169, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925).

and the distribution of the resulting profits when it found in its verdict, that an overt act in furtherance of the bank fraud conspiracy occurred after October 12, 1984. So interpreted, this jury verdict is consistent with caselaw in the statute of limitations context, wherein we have held that a "conspiratorial agreement that includes a payoff . . . continues . . . until the conspirators receive their anticipated profits." *United States v. Fletcher*, 928 F.2d 495, 500 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991); *accord United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.) ("where a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants"), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). We see no reason why this rule does not extend to the continuing criminal activity presented in this case. We hold that appellant's convictions for bank fraud and conspiracy to commit bank fraud are not barred by the *Ex Post Facto* Clause.

Duncan also contends that his conviction for conspiracy (Count One) should be overturned because the charge of conspiring to impair, obstruct, and defeat the lawful functioning of the IRS is time-barred. Appellant's conviction for conspiracy is sustained by evidence of acts committed in furtherance of the bank fraud—acts that were identified in Count One of the indictment as overt acts. Under the Supreme Court's ruling in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), when a defendant is convicted of a multiple object conspiracy by a general verdict, the conviction is sustainable if one of the conspiratorial objects is supported by the evidence, even if the other is not. *Id.*, 502 U.S. at —, 112 S.Ct. at 469. The *Griffin* Court reaffirmed the principle that " 'a general verdict . . . cannot be reversed on error, if any one of the counts is good and warrants the judgment, because, in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only.' " *Id.* (quoting *Claassen v. United States*, 142 U.S. 140, 146, 12 S.Ct. 169, 170, 35 L.Ed. 966 (1891)). In *Griffin*, the Supreme Court presumed that the jury

based its general verdict to convict on the error-free conspiratorial objective. *Id.*, 502 U.S. at — —, 112 S.Ct. at 469–70. In the present case, speculation as to whether the jury convicted appellant based on the furtherance of the bank fraud is unnecessary since the verdict explicitly declares that Duncan "conspired . . . to commit bank fraud." Thus, it is clear that appellant was convicted on Count One through a conspiratorial objective that was not barred by the statute of limitations. We therefore affirm the conviction for conspiracy and see no need to review further appellant's statute of limitations argument.

*Sentencing Guidelines*

■ Duncan's final argument, that the district court erred in increasing his sentence on Counts Four and Five (the corrupt political payment charges) pursuant to U.S.S.G. § 3B1.1(a), must also fail. The district court increased Duncan's offense level four points based on its finding that Duncan played an aggravating role as a "leader in the corrupt payments scheme." U.S.S.G. § 3B1.1(a) provides for a four level enhancement "[i]f the defendant was [a] . . . leader of criminal activity that involved five or more participants or was otherwise extensive. . . ." "A district court's findings under section 3B1.1 regarding a defendant's role in a criminal activity is a factual determination that will not be overturned unless 'clearly erroneous.' " *United States v. Garcia*, 936 F.2d 648, 656 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991); *see also United States v. Young*, 932 F.2d 1510, 1512 (D.C.Cir.1991) (a reviewing court should "uphold the district court's sentence so long as it results from a correct application of the guidelines to factual findings which are not clearly erroneous"); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.) (appellate court should review a sentencing judge's findings of fact for clear error), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

Duncan does not challenge the § 3B1.1(a) increase on the grounds that the scheme involved fewer than five participants or that it was not extensive. Rather, he asserts that he was merely a passive participant, and thus, the district court's finding that he

played a leadership role in the corruption scheme was clearly erroneous. However, the Government presented sufficient evidence to support Judge Daly's finding that Duncan was a leader in the corrupt payment scheme. Duncan was the president of the Taft Group—the primary vehicle through which corrupt payments were made to Santopietro and his associates. Although Duncan claims that he was unaware of any political payoffs, this is directly contradicted by the testimony of his two Taft Group partners—Barbieri and Corpaci. They testified that they met regularly, often daily, with Duncan to discuss, *inter alia*, Taft Group ventures and that Duncan, to their knowledge, was aware of corrupt payments that were made. Duncan's awareness of the payoffs is further supported by the fact that he was licensed to deal in real estate and was frequently the central figure in certain Taft Group real estate ventures. And since the corrupt payments generally related to real estate projects of the Taft Group or other entities where Duncan was a principal, it is not unreasonable to infer that Duncan knew and approved of the payments. The Government presented considerable direct and circumstantial evidence of specific transactions wherein Duncan was aware of, and in some cases directly involved in, dispensing favors and payments. For example, evidence was presented that Duncan was involved in the leasing of uninhabitable office space, through which he and his partners funnelled payments totaling $63,000 to Santopietro. The evidence supports a finding that Duncan knew of and profited from corruption, certainly while he was the president of the Taft Group, the central institutional party in several corrupt schemes, and that he was a principal figure in numerous other entities that were also instruments of corruption. Given the abundance of evidence, the district court's decision to assess a four step sentence increase based on Duncan's leadership role was not at all clear

error.[6] *See United States v. Cotto,* 979 F.2d 921, 922–23 (2d Cir.1992) (finding a supervisory role enhancement for a telephone dispatcher of a drug ring was not clear error); *United States v. Beaulieau,* 959 F.2d 375, 380 (2d Cir.1992) (not clearly erroneous to enhance sentence for supplier of drugs); *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir.1991) (not error to upgrade sentence pursuant to § 3B1.1, when defendant obtained drugs and hired carrier). Accordingly, we affirm the upward departure imposed by Judge Daly.

## CONCLUSION

Based on the foregoing, we affirm the judgment of conviction in all respects.

---

**6.** Arguing to the contrary, the appellant asserts that because he played a limited role in the payoff scheme in comparison to his two Taft Group partners—Barbieri and Corpaci—the district court was clearly erroneous. But such comparative analyses are irrelevant, since one conspirator's leadership role is not dispositive on the question of whether another was also a leader.

*Cf.* U.S.S.G. § 3B1.1, Application Note 4 ("There can, of course, be more than one person who qualifies as a leader ... [in a] conspiracy."); *Garcia,* 936 F.2d at 656. It was therefore not improper for Judge Daly to upwardly adjust Duncan's sentence, even after concluding that Duncan was not a leader "to the overt extent that Barbieri and Corpaci were."