**UNITED STATES of America,
Appellee,**

v.

**Rafael BURGOS; LNU1–00CR0744–
003, Defendants,**

---

Alan Dyckman, Defendant–Appellant.

Docket No. 02–1234.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 3, 2002.

Decided: March 25, 2003.

Michael S. Washor and Nicholas J. Pinto, New York, New York, for Defendant–Appellant.

Katherine Polk Failla, Assistant United States Attorney, New York, New York, (James B. Comey, United States Attorney for the Southern District of New York, Michael S. Kim, Assistant United States Attorney, of counsel), for Appellee.

Before: VAN GRAAFEILAND, CARDAMONE, and JACOBS, Circuit Judges.

JACOBS, Circuit Judge.

Defendant–Appellant Alan Dyckman appeals the sentence imposed in the United

States District Court for the Southern District of New York (Pauley, *J.*), following Dyckman's guilty plea to conspiracy to commit bank fraud. Dyckman challenges a three-point upward adjustment to his base offense level premised on his role as manager or supervisor, and the court's refusal to depart downward to accommodate Dyckman's family responsibilities. Dyckman was sentenced principally to 30 months' imprisonment.

Dyckman cashed checks he knew to be stolen. As to the role adjustment, he argues that he did not manage or supervise the people who brought him checks (stolen from one bank), or the people (on the other end) who accepted the checks at discount, or his co-defendant in the illicit check-cashing enterprise. The district court, however, found that Dyckman was "more than a mere middleman."

We conclude that the facts do not support the aggravating role adjustment, vacate the sentence, and remand for resentencing. We further conclude that we are without jurisdiction to entertain Dyckman's challenge to the district court's refusal to depart downward, and therefore dismiss the appeal in part.

## BACKGROUND

Alan Dyckman and his co-defendant Rafael Burgos conducted a check-cashing operation for stolen checks at the premises of All Boroughs Realty ("All Boroughs"). Dyckman owned All Boroughs, a Manhattan business, and Burgos was employed there. In a nutshell, the two accepted checks stolen by bank employees, cashed them at discount with people who had contacts at other banks, kept a portion of the proceeds, and remitted the rest to the people who submitted the stolen checks. The particular incidents recounted below bear upon the enhancement.

In December 1999, Eric Dominguez, an employee of United States Trust Company ("U.S.Trust"), approached a coworker, Johnny Alejo, about joining the stolen check cashing scheme. Dominguez explained to Alejo that he was stealing checks from the U.S. Trust mailroom, giving them to a contact, and receiving 50% of the proceeds. The following month, Alejo gave Dominguez two stolen checks, together worth $11,000, and Dominguez gave them to Dyckman. Several weeks later, Dominguez advised Alejo to call Dyckman about receiving payment. Dyckman told Alejo to visit the All Boroughs office, and that Burgos would pay Alejo his share of the proceeds. In that conversation, Dyckman referred to Burgos as his "right hand man." Alejo went to the All Boroughs office, and Burgos gave him $4000 to be split with Dominguez.

In May 2000, Alejo stole a $108,000 check from the U.S. Trust mailroom and brought it directly to Dyckman. Dyckman told Alejo that he had a "new connection" through which to negotiate checks. Burgos, who was also present, told Alejo that he possessed a $500,000 check and that the two checks ($108,000 and $500,000) would be negotiated through this new connection.

Burgos gave the two checks to one John Infanti, who was to negotiate them through a bank manager Infanti knew. During June and July 2000, Burgos repeatedly tried reaching Infanti to check the status of the two checks. In mid-July, Alejo contacted Infanti to find out why the transaction had not yet occurred. Finally, Dyckman contacted Infanti, and told Infanti that he should put pressure on his contact (the bank manager) and that he (Dyckman) wanted an up-front payment as a sign of good faith.

The next day, two men appeared at Infanti's office and stated that they were

there "on behalf of Alan Dyckman and Rafael Burgos."

At Infanti's office later that day, Dyckman and Infanti called a man who supposedly was Infanti's bank manager contact, and Dyckman repeatedly asked for an upfront, good-faith payment of the proceeds of the checks. The supposed bank manager was an undercover Postal Inspector. A few days later, Dyckman, Burgos, and Alejo were arrested.

Dyckman pleaded guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371, for which he was sentenced principally to 30 months' imprisonment.

## DISCUSSION

### A. Section 3B1.1(b)

At Dyckman's April 2, 2002 sentencing, the court increased Dyckman's offense level by three on the ground that Dyckman was a "manager" or "supervisor" of the criminal activity under United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(b), the text of which is set out in the margin.[1] The court found:

> [Alejo] brought checks to Dyckman and [Dyckman] secured payment for [Alejo] in return for those checks. Moreover, Dyckman was instrumental in advancing the negotiation by pressuring [Infanti] and demanding a good faith advance payment. Those facts demonstrate that Dyckman was more than a mere middle-

man in the scheme and thus a three point enhancement is warranted.

Apr. 2, 2002 Sentencing Tr. at 30.

When reviewing a sentence under the Guidelines, we must "accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the [sentencing] guidelines to the facts." 18 U.S.C. § 3742(e). "The deference that is due [under 18 U.S.C. § 3742(e) ] depends on the nature of the question presented." *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). On the one hand, no deference is owed if the alleged Guidelines error is arithmetic; on the other hand, an exercise of discretion to depart from the Guidelines is entitled to "substantial deference." *Id.* Unsurprisingly, cases in this Circuit are not wholly consistent in expressing how much deference is "due" the district court's determination when reviewing the imposition of an aggravating role adjustment. Some apply a clear error standard, *see, e.g., United States v. Rivera,* 971 F.2d 876, 893 (2d Cir.1992) ("The court's determination as to the defendant's role is a question of fact subject to the clearly erroneous standard."); others review the adjustment *de novo, see, e.g., United States v. Pollack,* 91 F.3d 331, 336 (2d Cir.1996) ("We review the district court's conclusion that a defendant was a 'manager' or 'supervisor' under U.S.S.G. § 3B1.1(b) *de novo,* as it involves a legal interpretation of the Sentencing Guidelines.").[2]

---

1. Section 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." U.S.S.G. § 3B1.1(b). It is undisputed that the criminal activity in this case involved at least five participants.

2. There is a similar division when the issue is whether a mitigating role adjustment applies

pursuant to U.S.S.G. § 3B1.2. *Compare United States v. Castaño,* 234 F.3d 111, 113 (2d Cir.2000) ("We review for clear error a sentencing court's finding that a defendant did not play a minor role in the offense."), *with United States v. Gaston,* 68 F.3d 1466, 1468 (2d Cir.1995) (per curiam) ("We review *de novo* the district court's legal conclusion as to whether the circumstances constitute 'minimal' or 'minor' participation.").

Here, the Government agrees with Dyckman that the district court's imposition of the aggravating role adjustment should be reviewed *de novo*. In any event, we think that under either standard of review (clear error or *de novo*) the district court erred in concluding that Dyckman was a "manager" or "supervisor" of the offense.

■ "A defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense ... or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Blount*, 291 F.3d 201, 217 (2d Cir.2002) (alterations in original) (quoting *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998) (per curiam)), *cert. denied*, —— U.S. ——, 123 S.Ct. 938, 154 L.Ed.2d 838 (2003). It is enough to manage or supervise a single other participant. *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir.1995). Once this management or supervision is found, the adjustment is mandatory. *United States v. Jimenez*, 68 F.3d 49, 51–52 (2d Cir.1995).

■ The district court premised the role adjustment on two facts; neither of them, alone or together, supports the adjustment.

First, the court cited Dyckman's role relative to Alejo: "[Alejo] brought checks to Dyckman and [Dyckman] secured payment for [Alejo] in return for those checks." Apr. 2, 2002 Sentencing Tr. at 30. This finding does not indicate that Dyckman exercised control over Alejo. The nature of this transaction itself does not bespeak control. Dyckman offered his services to Alejo (via Dominguez) as a broker of stolen checks, and furnished a cash incentive for Alejo's thefts; but there is no evidence that Dyckman directed Alejo (or anyone else) to steal checks, or

conditioned payment on any further acts by Alejo, or directed Alejo to call Infanti to find out the status of the final check. *Cf. Blount*, 291 F.3d at 217 (affirming § 3B1.1(b) adjustment where defendant was "in charge of distributing bundles of cocaine packages to the street sellers and collecting proceeds of their sales," and "check[ed] on whether [a street seller] was still at work ... [or] needed more bundles"). It can as easily be found that Dyckman (as broker) was serving Alejo as that Alejo (as thief) was serving Dyckman. The record is clear, moreover, that Alejo was recruited by Dominguez, his coworker at U.S. Trust; there is no evidence he was recruited by Dyckman. *Cf. Payne*, 63 F.3d at 1212 (affirming § 3B1.1(b) adjustment where defendant "had recruited [a co-conspirator] and paid her and three others to sell his crack").

Second, the district court relied on its finding that "Dyckman was instrumental in advancing the negotiation [of the final checks] by pressuring [Infanti] and demanding a good faith advance payment." Apr. 2, 2002 Sentencing Tr. at 30. These communications do not reflect Dyckman exercising control over Infanti. True, Dyckman demanded that Infanti speed up the process and provide an advance; but a demand that a debtor pay up, or make an advance, does not support an inference that the debtor is a subordinate. If anything, Infanti's nonpayment suggests independence. (The district court did not find, and the Government does not contend, that Dyckman recruited Infanti.)

The Government contends, alternatively, that Dyckman's conversations with Infanti support an inference that Dyckman controlled Burgos and Alejo because Dyckman contacted Infanti only after Burgos and Alejo failed to obtain payment. But there is no evidence that Dyckman ever directed Burgos or Alejo to contact Infanti

(they had ample interest in doing so themselves), or that the order of successive calls to Infanti reflected increasing seniority, or hierarchy (with Dyckman at the top). Similarly, there is no evidence that Burgos, who called Infanti first, was subordinate to Alejo, who called second.

The Government prudently offers alternative bases for upholding the adjustment, but none is convincing. First, the Government points out that Dyckman used the All Boroughs office to conduct the illicit scheme. This Court has held that the owner of a legitimate business who actively participates in criminal activity through the business may be eligible for an aggravating role adjustment, *see United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (per curiam), on the theory that the owner is enriched when the illegal activity adds to the business's bottom line. *See id.; United States v. Duncan*, 42 F.3d 97, 106 (2d Cir.1994). However, we have never upheld such an adjustment solely on the basis that the business premises were the location of some of the criminal activity, or that one of the company's employees also participated in the illicit business. *Cf. Duncan*, 42 F.3d at 105–06 (affirming § 3B1.1(a) adjustment for defendant who knew and approved of bribes paid through the company he served as president).

Second, the Government argues that Dyckman managed or supervised Burgos and Eric Dominguez. As to Burgos, however, the only evidence of control (aside from Burgos's legitimate employment at All Boroughs) is that Dyckman told Alejo that Burgos would pay Alejo his proceeds, and that Burgos was his "right hand man." Burgos's role as a co-conspirator who was holding the money and distributing it does not support an inference of subordinacy; if anything, the opposite inference predominates. The "right hand man" remark expresses trust, but there was nothing in the

exchange to suggest that Dyckman was characterizing Burgos's role in the conspiracy—which may be why the district court did not rely on that phrase as evidence supporting the adjustment.

Similarly, there is nothing to create an inference that Dyckman controlled Dominguez, whose role was like Alejo's: he brought stolen checks to Dyckman, and received a percentage of the proceeds.

Because we conclude that the facts do not support the aggravating role adjustment, we do not address Dyckman's alternative grounds for attacking it.

## B. Section 5K2.0

Dyckman also challenges the district court's exercise of discretion to deny a downward departure from the Guidelines to accommodate Dyckman's extraordinary family responsibilities. This Court "may review a district court's refusal to grant a downward departure ... so long as the court's decision was based on a mistaken conception of the court's authority under the Guidelines or was otherwise illegal." *United States v. Bonner*, 313 F.3d 110, 112 (2d Cir.2002) (per curiam). Dyckman does not contend that the unwarranted imposition of the aggravating role adjustment affected the district court's decision not to depart; therefore we may review the court's decision only if the court misapprehended the extent of its authority to depart.

■ Here, the district court expressly declared, "I recognize that I have the authority to depart downward." Apr. 2, 2002 Sentencing Tr. at 33. After reviewing this Circuit's case-law on downward departures for extraordinary family responsibilities, the district court declined to exercise its discretion. Contrary to Dyckman's assertions, the district court did not labor under any misapprehension of its authority. We

94

are therefore without jurisdiction to entertain this challenge.

## CONCLUSION

The sentence is vacated, and we remand to the district court for proceedings not inconsistent with this opinion. The appeal is dismissed insofar as it challenges the district court's refusal to make a downward departure.