**UNITED STATES of America,
Appellant,**

v.

**Albert HUERTA, Defendant–Appellee.**

**Docket No. 03–1513.**

United States Court of Appeals,
Second Circuit.

Argued: May 17, 2004.

Decided: June 10, 2004.

Kim A. Berger, Assistant United States Attorney for the Southern District of New York (Laura Grossfield Birger, Assistant United States Attorney, of counsel; James B. Comey, United States Attorney, on the brief), New York, NY, for Appellant.

Jeffrey M. Rubin, Rubin & Shang, New York, NY, for Defendant–Appellee.

Before: McLAUGHLIN, STRAUB, and LAY, Circuit Judges.*

---

\* The Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

PER CURIAM.

Defendant–Appellee Albert Huerta pleaded guilty on November 7, 2001 to two counts of conspiring to submit false statements and submitting false statements relating to health care matters in violation of 18 U.S.C. §§ 371, 1035 & 2. On July 15, 2003, the District Court (Lawrence M. McKenna, *Judge*) sentenced Huerta to five months' imprisonment, to be followed by five months of home confinement and three years of supervised release. The court also required Huerta to pay substantial restitution. In sentencing Huerta, over the government's objection, the District Court declined to apply a leadership role enhancement and granted Huerta a downward departure for "extraordinary family circumstances." The government appeals.

## BACKGROUND

In 1997, Huerta became the president of Liberty Testing Laboratory ("Liberty"), an independent clinical laboratory in Brooklyn, New York. Around the same time, he hired Ara Miranda as a sales representative to procure new client-doctors who would refer their bloodwork to Liberty.

Miranda, and several others who worked for her, paid the residents of a Miami trailer park for blood samples that they submitted to Liberty for testing. Another co-conspirator, Jose Hernandez, the owner of Dade Medical Billing, provided Miranda with the names and identification numbers of Medicare beneficiaries and doctors and Miranda attached those names to the blood samples that were submitted to Liberty.

Huerta knowingly arranged for the falsified samples to be tested and for Medicare

to be billed. Huerta admitted that he customized test requisition forms for Miranda so as to maximize the recovery from Medicare. Huerta and Liberty submitted claims to Medicare of over $4.5 million and received approximately $1.7 million before the scheme was uncovered.

On December 13, 1999, the government indicted Huerta on two counts of conspiring to submit false statements and submitting false statements relating to health care matters in violation of 18 U.S.C. § 371 and 18 U.S.C. §§ 1035, 2, respectively. Huerta pleaded guilty on November 7, 2001, without a plea agreement, to both counts of the indictment. During his plea colloquy, Huerta stated as follows:

> In 1997 and '98 when I was President of the Liberty Testing Laboratory[,] I agreed with others including Ara Miranda to fraudulently obtain Medicare funds. During this time[,] I and others caused Liberty to submit claims for payments to the Empire Medical Services in Manhattan for tests which I knew had not been authorized by doctors whose names appeared on the test order forms.

Five of Huerta's co-conspirators, including Miranda, Hernandez, Ramon Pichardo (Liberty's billing manager), and two of Miranda's workers, Doris Delatorre and Alejandro Pujol, were also eventually charged with health care fraud in connection with the scheme. Like Huerta, all five pleaded guilty.

## DISCUSSION

I. *The Section 3B1.1 Role Enhancement*

Under section 3B1.1(a) of the United States Sentencing Guidelines, a defendant's base offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The guideline further provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," the offense level should be increased by three levels. U.S.S.G. § 3B1.1(b).

■ In evaluating the District Court's decision not to impose a section 3B1.1 leadership-role enhancement on Huerta, it is well established that we review its factual findings for clear error. *See* 18 U.S.C. § 3742(e) ("The court of appeals ... shall accept the findings of fact of the district court unless they are clearly erroneous."); *United States v. Molina,* 356 F.3d 269, 275 (2d Cir.2004) (same). With respect to the District Court's application of the guidelines to the facts, we are to give "due deference" to the district court. 18 U.S.C. § 3742(e). As we explained in *United States v. Burgos,* 324 F.3d 88 (2d Cir.2003), however, "cases in this Circuit are not wholly consistent in expressing how much deference is 'due' the district court's determination when reviewing the imposition of an aggravating role adjustment. Some apply a clear error standard; others review the adjustment *de novo.*" *Id.* at 91 (collecting cases); *cf. United States v. Birkin,* 366 F.3d 95, 101 (2d Cir.2004) (applying abuse of discretion standard except "[w]here a sentencing court's application of the Sentencing Guidelines ... approaches a purely legal question" in which case *de novo* review is appropriate); *United States v. Si Lu Tian,* 339 F.3d 143, 156 (2d Cir.2003) (holding that whether the district court's factual findings "support an enhancement under section 3B1.1(a) ... represents a legal question, which we review *de novo*"). We need not resolve the apparent inconsistency in our precedents, however, because we would reach the same result irrespective of the standard applied.

Huerta has conceded that there were five or more participants in the conspiracy. As such, the District Court's task was merely to determine the role he played with respect to those other participants. After considering the parties'. arguments, the District Court concluded that none of the three people who made integral contributions to the conspiracy could "be considered more important than the others" because while co-conspirator Ara Miranda bore principal responsibility for collecting the blood samples (from individuals who were not actually Medicare beneficiaries), co-conspirator Jose Hernandez contributed the fraudulent physician and patient information, and "Huerta had the blood testing and billing capabilities to complete the scheme." The District Court explained that it could not "find ... any convincing evidence [that] the defendant was responsible for organizing these others for the purpose of carrying out the scheme." The court went on to say that "[t]he fact that the defendant was the head of the company is also not relevant" because "[i]t's role in the offense conduct that is relevant."

■ There are two immediate problems with the District Court's analysis. First, the fact that others in the conspiracy also played leadership or managerial roles is "not dispositive" of whether Huerta played such a role. *Si Lu Tian*, 339 F.3d at 158; *see also* U.S.S.G. § 3B1.1, cmt. n. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

■ Second, the District Court seems to have been inappropriately dismissive of the significance of Huerta's role as the president of Liberty, the company through which the integral final step of the Medicare fraud was accomplished. In *United States v. Duncan*, 42 F.3d 97 (2d Cir.1994), we held that a leadership role enhance-

ment was warranted because the defendant was the president of a real estate development corporation that was "the primary vehicle" through which the corrupt payments and bribes at issue in the case were made, and it was established that the defendant "knew of and profited from [the] corruption." *Id.* at 106; *see also United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir.1997) (per curiam) (vacating and remanding for resentencing because the district court had not imposed a role enhancement; defendant was the owner of a car dealership that was the locus of operations for a major money laundering scheme and an "active participant" in the scheme); *United States v. DeRiggi*, 72 F.3d 7, 9 (2d Cir.1995) (per curiam) (holding that "when a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a four-level enhancement ... is proper"). Although we have also made it clear that such role enhancements should not be *automatically* imposed on business owners or executives, *see Burgos*, 324 F.3d at 93, there is enough evidence of Huerta's active involvement in the conspiracy at issue in this case to undercut the District Court's assertion that Huerta's role as president of Liberty was "not relevant" to the role enhancement analysis.

Our review of the District Court's decision to deny the role enhancement is further complicated by the fact that the court's factual findings—particularly as to contested issues—were limited. The District Court indicated in the judgment that it had "adopt[ed] the factual findings and guideline application in the presentence report except ... as set forth on the record on 7/15/03." Unfortunately, the record is not entirely clear about the court's ultimate determination as to, *inter alia*: (i) whether Huerta had knowledge of the fraudulent scheme when he hired various

of his co-conspirators; (ii) whether Huerta knew all of the other participants and the extent of his direct involvement with them; (iii) whether Huerta arranged for Miranda to be paid in a manner that would conceal her involvement; and (iv) the extent of Huerta's knowledge of what specifically was transpiring in Florida at the trailer parks where Miranda collected the blood samples. The District Court also neglected to find other facts that would have further informed the role-enhancement inquiry. For example, there is no evidence of how much Huerta actually profited from the fraud relative to his co-conspirators. In addition, one of the government's more serious allegations against Huerta—that he intervened to prevent one of his employees who was not a participant in the scheme from investigating allegations that Liberty was submitting false claims—was not contained in the PSR, not adopted by the District Court at the hearing, and not conceded by Huerta.

The government claims, however, that even considering only those facts that were actually found by the District Court, it is clear as a legal matter that Huerta should have been given the four-level leadership enhancement. Application note 4 to section 3B1.1 of the Sentencing Guidelines provides a short list of "[f]actors the court should consider" in evaluating a defendant's role in the offense, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4. These factors may be useful "[i]n distinguishing a leader-

ship and organizational role from one of mere management or supervision." *Id.*

■ In this case, the first two factors and the final two factors weigh in favor of at least a three-level enhancement. Huerta conceded that he had "hiring and firing control" over various of his co-conspirators, including presumably Miranda, Pichardo, Delatorre, and Pujol. Huerta made key decisions that maximized the proceeds of the fraud, including the decision to create a customized requisition form for Miranda to use. Finally, he admitted to having overseen the final stages of an extensive fraud, including the submission of the claims to Medicare, and the payment of his co-conspirators. In light of these facts, we find that the District Court should have imposed at least a three-level role enhancement under section 3B1.1(b).

■ The current state of the record, however, leaves open important factual questions regarding the other three factors listed in application note 4, i.e., Huerta's role in planning and organizing the scheme, his role in recruiting and managing accomplices, and his share of the revenue from the conspiracy. *See* U.S.S.G. § 3B1.1, cmt. n. 4. As such, we remand the case to the District Court to make additional findings, including those enumerated *supra* at 92–93, to determine whether a four-level leadership enhancement is warranted by the facts of Huerta's case. Otherwise, the three-level enhancement provided by section 3B1.1(b) of the Sentencing Guidelines should be imposed.

## II. *The Extraordinary Family Circumstances Departure*

■ The government also objects to the District Court's decision to grant Huerta a four-level downward departure for extraordinary family circumstances. The Supreme Court, in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d

392 (1996), explained that "a defendant's family ties and responsibilities" are a "discouraged" basis for departure under the Sentencing Guidelines. *Id.* at 95, 116 S.Ct. 2035; *see also* U.S.S.G. § 5H1.6 ("Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). "A court still may depart on the basis of such a factor but only if it 'is present to a degree substantially in excess of that which ordinarily is involved in the offense.'" *Koon,* 518 U.S. at 95, 116 S.Ct. 2035 (quoting U.S.S.G. § 5K2.0).

Huerta was sentenced on July 15, 2003, over two months after the effective date of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub.L. No. 108–21, 117 Stat. 650 (2003), codified at 18 U.S.C. § 3742(e)(3)(B) ("PROTECT Act"). The PROTECT Act requires us to review *de novo* "whether a departure is 'justified by the facts of the case.'" *United States v. Simmons,* 343 F.3d 72, 78 (2d Cir.2003) (quoting PROTECT Act, § 401(d), codified at 18 U.S.C. § 3742(e)(3)(B)(iii)); *see also United States v. Kostakis,* 364 F.3d 45, 51 (2d Cir.2004).

In this case, the District Court justified its decision to depart as follows:

> [T]he facts as I understand them are not simply that Mr. Huerta's wife is not employed and that they have minor children, who are, I think, approximately eight and 11 years old. He also gives financial support and moral support and physical support to his father, who, as I understand it, is only 62 years old, but has had a massive stroke, and is paralyzed on his left side, and does not have medical insurance ... and ... cannot obtain home care services for that reason. And who has a wife, but she is out

of the house, at least during the working week, 2:30 in the afternoon, doesn't get back until about 2:00 in the morning.

Mr. Huerta's father is obviously somebody who needs care, and in this very difficult situation, it appears that he visits his father regularly, supplements his father's wife['s] income by purchasing food and medicine for the family, and actually assists his father in bathing, which due to paralysis his father can't do by himself.

In view of the totality of these particular circumstances, I do believe a departure is in order to a degree in this extraordinary situation and I am going to depart to a level 12 on the ground of family circumstances.

The other cases in which we have affirmed downward departures for family circumstances or family ties each presented extraordinary factors that weighed in favor of such a departure.[1] *See, e.g., United States v. Galante,* 111 F.3d 1029, 1032, 1035 (2d Cir.1997) (affirming departure where defendant was sole provider for his wife (who had a "limited earning capacity" because of her difficulty speaking English) and their two children (ages 8 and 9)); *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992) (finding extraordinary family circumstances where the defendant was the sole caretaker for her three children and the young child of her institutionalized daughter); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991) (affirming downward departure where the defendant and his wife were responsible for caring for their two daughters (ages 4 and 11), the defendant's disabled father (who depended on the defendant to help him in and out of his wheelchair) and the defendant's grandmother).

---

**1.** In addition, we note that each of these cases was decided under the much more deferential, pre-PROTECT Act, abuse-of-discretion standard.

In other cases presenting less compelling circumstances, we have rejected family circumstances departures. *See, e.g., United States v. Smith*, 331 F.3d 292, 293–94 (2d Cir.2003) (holding that the defendant's family circumstances did not warrant a departure where defendant's wife, a part-time college student, earned about $1400 per month and his mother and half-sister lived only two, blocks away from him and might be expected to assist with childcare for his two-year-old son); *United States v. Madrigal*, 331 F.3d 258, 260 (2d Cir.2003) (per curiam) (holding that family circumstances departure was inappropriate where only one of the defendant's six children was under the age of eighteen and there was evidence that the three older children (and perhaps members of the defendant's extended family) would be able to care for the younger siblings); *United States v. Faria*, 161 F.3d 761, 763 (2d Cir.1998) (per curiam) (holding that defendant's family was not "uniquely dependent" on him because his three children did not live with him and his ex-wife earned approximately $40,000 annually as a systems analyst).

 The parties disagree about whether Huerta's case is closer to the *Galante–Johnson–Alba* line of cases or to *Smith, Madrigal*, and *Faria*. The principal problem we face in trying to resolve that question *de novo* is that there are some important findings that the District Court did not explicitly make. For example, the government argued below and argues again on appeal that "there are a number of other adult family members, on both [Huerta's wife's] side and his side of the family, who would be able to assist in providing financial support or child-care assistance." Huerta disagrees. As the cases cited above make clear, this factor—the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents—is a central part of the extraordinary family circumstances inquiry. *See Smith*, 331 F.3d at 294; *Madrigal*, 331 F.3d at 260; *Faria*, 161 F.3d. at 762; *Galante*, 111 F.3d at 1032; *Johnson*, 964 F.2d at 129. We are not in a position to evaluate the government's claim about the role that other family members could play in assisting Huerta's wife, children, and father because the District Court did not address that issue at the sentencing hearing.

In addition, the District Court made no findings about Huerta's wife's ability to sustain the family business on her own while Huerta was incarcerated. The government asserts that because "Huerta's sole source of income is the business that he and his wife run out of their home, his wife is uniquely situated to care for the children as well as continue to run the business." Huerta's wife claimed in her letter to the District Court that she was not capable of running the family business without Huerta. The most that the District Court said on this issue was that it was limiting Huerta to five months' incarceration because the court's "hope is that [Huerta's wife] will be able to keep this business going and, perhaps, be assisted by telephone … contact during this period of incarceration." The court suggested, but made no finding, that Huerta's wife would struggle to keep the business afloat if he were incarcerated for a period longer than five months. Here again, our ability to review the sentence *de novo* is compromised by the absence of an explicit finding regarding Huerta's wife's precise role in the business and her ability to run the business in her husband's absence.

In light of these deficiencies in the record, we remand the case to the District Court for additional factfinding. Huerta (who was sentenced in July 2003) has presumably completed the five-month incarceration portion of his sentence. Thus the

District Court's analysis on remand of how the Huerta family might be able to cope in the defendant's absence will be informed by five months of the family's actual experience with Huerta's incarceration. *Cf. United States v. Lauersen*, 348 F.3d 329, 344 n. 16 (2d Cir.2003) (explaining that the PROTECT Act does not bar a district court from considering grounds for departure that did not exist at the time of the original sentencing), *adhered to on reh'g*, 362 F.3d 160 (2004), *cert. denied*, —— U.S. ——, 124 S.Ct. 2190, 158 L.Ed.2d 735 (2004); *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir.2002) ("[E]ven when a remand is limited, an issue may be raised if it arises as a result of events that occur after the original sentence."), *cert. denied sub nom., Donato v. United States*, 539 U.S. 902, 123 S.Ct. 2246, 156 L.Ed.2d 110 (2003).

Finally, we note that the PROTECT Act also imposes on district courts a new requirement that they must, in granting departures of any kind, "state[ ] with specificity" in the judgment the "specific reason" for the departure. 18 U.S.C. § 3553(c)(2). In this case, the judgment states merely that the District Court departed because of the defendant's "extraordinary family circumstances" and refers to the transcript. If, after supplementing the record in the manner outlined above, the District Court elects to grant a family circumstances departure, it must record in the judgment the specific reasons that support its decision.

## CONCLUSION

For the foregoing reasons, this case is remanded to the District Court for further proceedings consistent with this opinion and for resentencing.